```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
```
MARY V. MEYER,

            Appellant,

  -against-                      **MEMORANDUM AND ORDER**
                                            Case No. 2:18-CV-2955 (FB)

BISSETT NURSERY CORP.,

            Appellee.
```
--------------------------------------------------x
```

*Appearances:*
| For the Appellant: | For the Appellee: |
|---|---|
| RICHARD F. ARTURA | JEFFREY HERZBERG |
| Phillips, Artura & Cox | Zinker & Herzberg, LLP |
| Post Office Box 405 | 300 Rabro Drive, Suite 114 |
| Lindenhurst, New York 11757 | Hauppauge, New York 11788 |

**BLOCK, Senior District Judge:**

      Mary V. Meyer appeals an order of the bankruptcy court denying her a discharge of her debts after finding that she refused to obey an order requiring her to turn over documents. For the following reasons, the Court vacates the order and remands for further proceedings.

I

      Mary and her husband, Douglas, declared bankruptcy in July 2016. According to their joint petition, each had a 50% ownership interest in three defunct landscaping businesses. One of the businesses had run up a total of $425,000 in credit from Bissett Nursery Corp. ("Bissett"), with Douglas personally guaranteeing

the debt.

During the bankruptcy proceedings, the bankruptcy court entered a "2004 Order"[1] requiring the Meyers to produce an extensive list of documents:

(a) personal and business income tax returns since January 1, 2010;

(b) financial statements "pertaining to any and all borrowings and leasings";

(c) contracts between the landscaping companies and 32 other entities;

(d) sources and uses statements for those contracts;

(e) personal and business bank statements since January 1, 2010;

(f) records of all personal and business disbursements since January 1, 2010;

(g) mortgages, leases and/or security agreements;

(h) balance sheets for the businesses since January 1, 2010;

(i) income statements for the businesses since January 1, 2010;

(j) all correspondence and communications with Bissett;

(k) invoices and statements from Bissett "with proof of payment thereof";

(l) titles to vehicles and landscaping equipment; and

(m) proof of insurance for those vehicles and equipment.

Record ("R.") at 13-15. In response, the Meyers produced their personal tax returns and, later, a "box load" of documents in partial compliance with the 2004

---

[1] So called because Federal Rule of Bankruptcy Procedure 2004 authorizes bankruptcy courts to order "the examination of any entity," which examination may include compelling testimony and the production of documents.

Order.  R. at 21.

Bissett then brought an adversary proceeding.  Its complaint asked the bankruptcy court not to discharge the Meyers' debts because they had "failed to obey" the 2004 Order.  R. at 9.  The Meyers denied that allegation, representing that they had complied with the order "to the extent that the documents were available or in existence," and explaining that many records had been shredded "after the company ceased operation."  R. at 21.

The bankruptcy court then tried the complaint.  The Meyers' counsel stipulated that his clients had received the order and that some of the documents were produced late, while others were not produced at all.[2]

Bissett then called Douglas as a witness.  Douglas testified that he "caused corporate documents to be shredded" in late March or April of 2016 (about three months before declaring bankruptcy).  R. at 85.[3]  He further testified that "[b]asically everything that was in the office" was shredded at his direction.  R. at 89.  However, he did not "look at any documents before they were shredded" because he was recuperating from a three-month hospital stay.  R. at 111; *see also id.* ("I was not there.").

---

[2]In her appellate brief, Mary concedes that no documents were produced in five of the thirteen categories listed in the 2004 Order.

[3]At a pre-trial deposition, Douglas testified that the documents were shredded in Janunary 2016.

3

When the 2004 Order was issued, the Meyers' bankruptcy lawyer told Douglas to get "all the documents together that [I] could possibly get together and as fast as I can." R. at 114. "[O]ne of the girls in the office managed to find" copies of some documents, R. at 91; he was able to get copies of others from banks and the Meyers' accountant. In addition, he asked his office manager to "download everything from [his computer] and to hand it over." R. at 124.

Bissett's second and final witness was its former general counsel, who testified that the company had sold its assets and was winding down, but still held the debt and Douglas's personal guarantee. Bissett then rested. The Meyers rested without putting on a case.

Neither side called Mary to testify. At the conclusion of the trial, the bankruptcy court observed:

> I don't have any evidence that Mrs. Meyer was involved in any way with the destruction of documents. Nobody has alleged that. Mr. Meyer said he did it or directed it.

R. at 143.

The bankruptcy court later issued a written decision, in which it described the issue as "whether the Debtors acted willfully and intentionally in refusing to comply with the 2004 Order based on their failure to produce documents regarding their business interests." R. at 147. The bankruptcy court began its analysis by noting, "It is undisputed that both Debtors received the 2004 Order and failed to turn over

4

many of the requested documents." R. at 158. It then stated that "the burden shifts to the Debtors to justify their noncompliance." R. at 158.

Turning first to Douglas, the bankruptcy court rejected the justification that "there were no available copies to produce." R. at 158. It described that justification as a "defense of 'impossibility'" and found that "the impossibility of obtaining the records in this case was a result of Mr. Meyer's own wrongdoing." R. at 158.

With respect to Mary, the bankruptcy court stated that "Mrs. Meyer did not testify at trial nor did she offer a separate explanation for her failure to comply with the 2004 Order." R. at 159. However, in contrast to its post-trial statement acknowledging that there was no evidence that Mary was involved in the shredding, the bankruptcy court held the lack of evidence against her, finding that she "failed to meet her burden of offering a justifiable excuse for her noncompliance." R. at 159.

Based on its findings, the bankruptcy court denied the Meyers a discharge. Mary appealed; Douglas did not.

## II

The discharge of debts is "the foundation upon which all other portions of the Bankruptcy Code are built." *In re Anderson*, 884 F.3d 382, 389 (2d Cir. 2018). "[T]he 'fresh start' procured by discharge [is] the 'central purpose of the bankruptcy

code' as shaped by Congress, permitting debtors to obtain a 'fresh start in life and a clear field unburdened by the existence of old debts.'" *Id.* (quoting *In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir. 2002)).

The "fresh start" offered by a discharge is available, however, "only to an honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (internal quotation marks omitted). To that end, 11 U.S.C. § 727 authorizes a bankruptcy court to deny a discharge in certain circumstances. The denial of a discharge lies within the bankruptcy court's sound discretion, *see In re Beeber*, 239 B.R. 13, 31 (Bankr. E.D.N.Y. 1999) (citing *In re Kokoszka*, 479 F.2d 990, 997 (2d Cir. 1973), with the caveat that denial of a discharge is "an extreme penalty for wrongdoing." *In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996). Therefore, the statute "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *Id.*

Pertinent here is subsection (6)(a), which allows the bankruptcy court to deny a discharge if "the debtor has refused . . . to obey any lawful order of the court, other than an order to respond to a material question or to testify." "Under this subsection, a plaintiff must prove that the court issued an order and that the debtor refused to obey that order." *In re Sofer*, 519 B.R. 28, 34-35 (Bankr. E.D.N.Y. 2014).

A "refusal" is not simply a failure to comply. *See In re Demar*, 373 B.R.

232, 240 (Bankr. E.D.N.Y. 2007) ("[T]he mere failure of a debtor to obey a court's order, without more, is insufficient to deny or revoke a debtor's bankruptcy discharge." (internal quotation marks omitted)). Rather, the word implies that the debtor acted "willfully and intentionally"; noncompliance "resulting from inadvertence, mistake, or inability to comply" will not suffice. *In re Gardner*, 384 B.R. 654, 670 (Bankr. S.D.N.Y. 2008).

Courts adjudicating claimed violations of § 727(6)(a) use a burden-shifting approach: "[O]nce a plaintiff has shown that the debtor violated a court order, the burden shifts to the debtor to either justify the violation or prove that the violation did not in fact occur." *In re Sofer*, 519 B.R. at 35. This refers only to the burden of *production*, however; the burden of *persuasion* remains with the party objecting to the discharge. *See In re Gardner*, 384 B.R. at 663 ("Shifting burdens of production . . . will not shift the ultimate burden of persuasion."). In particular, the party opposing discharge "must demonstrate some degree of volition or willfulness on the part of the debtor." *Id*. at 670. Only then must the debtor "put forward evidence that he or she has not committed the objectionable act." *Id.* (internal quotation marks omitted).

### III

On appeal, "[a] bankruptcy court's "factual findings will be upheld unless clearly erroneous, and its legal conclusions are reviewed *de novo*." *In re Flanagan*,

7

503 F.3d 171, 179 (2d Cir. 2007). Since it was undisputed that Mary did not comply with the 2004 Order, the burden shifted to her to explain her noncompliance. The bankruptcy court held that she failed to meet that burden because she "did not testify at trial nor did she offer a separate explanation for her failure to comply with the 2004 Order." R. at 31.

This was an error of law. The answer, filed on behalf of both Douglas and Mary, claimed that many documents called for by the 2004 Order were shredded. Douglas testified that he was responsible for the shredding. Although Mary did not testify or offer a separate explanation, she was perfectly entitled to rely on her husband's testimony in support of a joint explanation.

With respect to Douglas, of course, the bankruptcy court rejected that explanation because "[t]he impossibility of obtaining the records in this case was a result of Mr. Meyer's own wrongdoing." R. at 30. By contrast, it noted that there was no evidence that "Mrs. Meyer was involved in any way with the destruction of documents." R. at 143.

The bankruptcy court apparently reasoned that it was up to Mary to prove that she played no role in the shredding and, therefore, that the lack of evidence weighed against her. This misunderstands Mary's burden. Once Bissett had shown that the order was violated, Mary had to offer a justification. As explained above, Douglas's testimony was sufficient to satisfy that burden. But the bankruptcy court

8

imposed the additional burden of offering evidence (and, perhaps, proving) that Mary was not at fault.[4]

To the contrary, it was Bissett's burden to "demonstrate some degree of volition or willfulness on the part of the debtor." *In re Gardner*, 384 B.R. 670. *In re Gardner* illustrates proper allocation of that burden. In that case, a court order required the debtor to file a schedule of unpaid debts. The debtor conceded that he had not done so but testified at trial that "it was an oversight." *Id.* The bankruptcy court interpreted that testimony as "claiming inadvertence," and noted that "[t]he Trustee has not produced any additional evidence to refute this claim of inadvertence and provide evidence that the lack of action was an intentional refusal to comply with the court's order." *Id.* Therefore, the bankruptcy court found, "the Trustee has not met his ultimate burden of persuasion under [§ 727(6)(a)]." *Id*.

Bissett objects that the debtor in *Gardner* testified, while Mary did not. But both Mary and Douglas clearly intended to rely on the shredding of documents as the justification for their failure to comply with the 2004 Order; the source of the

---

[4]The bankruptcy court's error may have stemmed from its description of the proffered justification as a "defense of 'impossibility[.]'" R. at 30. Since the burden of persuasion always remains with the party opposing discharge, the burden of offering a justification for noncompliance with a court order is not a "defense" in the usual sense. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting *Black's Law Dictionary* definition of "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim, *even if all allegations in the complaint are true.*" (emphasis added)).

9

evidence offered in support of that justification is of no consequence. Bissett disagrees, arguing that "[i]f Mary had testified at the trial, Bissett would have examined her in great detail concerning her role, if any, in the 'shredding of documents.'" Appellee's Br. at 7. If Bissett wished to explore that issue, it was free to call Mary as a witness, just as it had called Douglas to question his *bona fides*.

## IV

In sum, the bankruptcy court correctly acknowledged that there was no evidence that Mary had anything to do with the shredding, but incorrectly assigned to her the burden of disproving her involvement. Therefore, the Court must vacate the order denying her a discharge. However, since the trial proceeded under an incorrect assumption, the Court will remand with instructions to reopen the proceedings to allow Bissett, if it so chooses, to elicit Mary's testimony or any other evidence relevant to the issue.[5]

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 4, 2019

---

[5]The Court urges Bissett to first assess the practicalities of its position. The bankruptcy court's order denying Douglas a discharge means that Bissett can attempt to collect his debt in state court. As far as the Court can glean, by contrast, Mary does not owe Bissett anything.

10